No.   93-448

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

BILLIE SMITH, Personal
Representative of the Estate
of Richard A. Smith, deceased,
and on behalf of Philana V.
Smith and Estelle M. Smith,
children of the deceased,

      Plaintiff and Appellant,

  -vs-

BUTTE-SILVER BOW COUNTY,
a consolidated government,
and the STATE OF MONTANA,

      Defendants and Respondents.

FILED

JUL 11 1994

*El Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Second Judicial District,
                In and for the County of Silver Bow,
                The Honorable Mark P. Sullivan, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Thomas M. Malee, Attorney at Law, Billings,
          Montana

      For Respondent Butte-Silver Bow County:

          John M. Maynard, Marcia D. Morton; Browning,
          Kaleczyc, Berry & Hoven, Helena, Montana

      For Respondent State of Montana:

          James P. Harrington, Attorney at Law, Butte,
          Montana

Submitted on Briefs:   February 24, 1994

Decided:   July 11, 1994

Filed:

                      Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

In this appeal, we review orders of the Second Judicial District Court, Silver Bow County, granting summary judgment on the basis of prosecutorial immunity to Butte-Silver Bow County (the County) and the State of Montana (the State), denying leave to amend a complaint, and dismissing claims due to discovery abuse. We reverse the summary judgment in favor of the County and affirm the summary judgment in favor of the State, but on different grounds than prosecutorial immunity. We also affirm the District Court's refusal to allow amendment of the complaint and decline to address its dismissal of claims due to discovery abuse.

In February of 1989, Richard A. Smith (Richard) was arrested, charged with the robbery of a Town Pump Food Store in Butte, Montana, and incarcerated at the Butte-Silver Bow County Jail (County Jail). The following month, he was transferred to Warm Springs State Hospital (the State Hospital) for a psychiatric evaluation to determine whether he suffered from a mental disease or defect and had the capacity to stand trial and to form the requisite mental state for the offense charged. He escaped and subsequently was apprehended and returned to the County Jail. On May 16, the State Hospital sent a report to the Silver Bow County Attorney (County Attorney), the District Court and Richard's defense counsel indicating, among other things, that Richard was competent to stand trial.

Richard was found dead in his cell at the County Jail on May

2

28, 1989. Although his death was caused by self-inflicted asphyxiation, it is disputed whether death was intentional or occurred accidentally during an escape attempt involving a feigned suicide.

On April 8, 1991, Billie Smith (Smith), Richard's mother, filed a complaint containing a negligence claim on behalf of Richard's estate and a wrongful death claim on behalf of his minor children. She alleged that agents or employees of the County, knowing from the State Hospital report that Richard was a suicide risk, negligently failed to take steps to safeguard his life. She also asserted that the individuals involved were employees or agents of the State. As the case developed, it became clear that Smith's claims focused on the failure of the County Attorney to advise the County Jail of the allegedly lifesaving information in the report.

In August of 1992, the County and the State filed motions for partial summary judgment and summary judgment, respectively, on the basis of prosecutorial immunity. The following month, the County filed a motion to dismiss Smith's complaint with prejudice under Rule 37(d), M.R.Civ.P., based on her failure to answer interrogatories and to supplement discovery requests. Smith opposed the motions and, in October of 1992, moved to amend her complaint to add a claim against the State based on the alleged negligence of employees at the State Hospital.

Following a hearing on the County's motion to dismiss held on November 4, 1992, the District Court held the motion in abeyance

3

and directed Smith to respond to discovery requests within thirty days of the date of the hearing. The court subsequently denied Smith's motion for leave to amend the complaint and, by separate order, granted the County's and the State's motions for summary judgment. The court concluded that prosecutorial immunity precluded any liability on their part stemming from the County Attorney's actions.

On December 28, 1992, the County filed a second motion for dismissal of the complaint with prejudice under subsections (b) and (d) of Rule 37, M.R.Civ.P. Following a second hearing on the matter held on April 30, 1993, the District Court dismissed the complaint without prejudice under Rule 37(b), M.R.Civ.P.

Did the District Court err in granting partial summary judgment and summary judgment in favor of the County and the State, respectively?

The District Court determined that the claims against the County and the State were premised on acts or omissions by the County Attorney in his prosecutorial capacity. On that basis, it concluded that both were immune from liability under the doctrine of prosecutorial immunity and granted summary judgment accordingly.

Our standard for reviewing a grant of summary judgment is the same as that used by the district court. Emery v. Federated Foods (Mont. 1993), 863 P.2d 426, 431, 50 St.Rep. 1454, 1456. In the usual case, we determine whether there is an absence of genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. Minnie v. City of Roundup (1993), 257

4

Mont. 429, 431, 849 P.2d 212, 214. Here, we discern no genuine issues of fact that are material to the issue of whether the County and the State are immunized from liability arising from conduct by the County Attorney. Thus, we focus solely on the court's conclusion that the County and the State were entitled to judgment as a matter of law based on prosecutorial immunity. Our review of legal conclusions is plenary. Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

Smith argues that prosecutorial immunity does not shield the County and the State from liability because the County Attorney was acting within an administrative capacity when he failed to notify the County Jail of Richard's purported suicidal tendency. We agree.

As quasi-judicial officers, prosecutors enjoy immunity from civil liability for conduct within the scope of their duties, allowing the unfettered enforcement of criminal laws. Ronek v. Gallatin County (1987), 227 Mont. 514, 516, 740 P.2d 1115, 1116.

> "The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust."

Ronek, 740 P.2d at 1116, quoting Imbler v. Pachtman (1976), 424 U.S. 409, 422-23, 96 S.Ct. 984, 991, 47 L.Ed.2d 128, 139. Prosecutorial immunity has been extended to counties and the state for the acts of their quasi-judicial officers. Dep't of Justice v.

5

District Court (1977), 172 Mont. 88, 92-93, 560 P.2d 1328, 1330; and Ronek, 740 P.2d at 1116-17.

Prosecutorial immunity, however, does not shield prosecutors from civil liability for all acts or omissions performed in the course of their employment. We consistently have stated that, "[w]hen a prosecutor acts within the scope of his duties by filing and maintaining criminal charges he is absolutely immune from civil liability, regardless of negligence or lack of probable cause." Dep't of Justice, 560 P.2d at 1330; Ronek, 740 P.2d at 1116 (emphasis added). We observe that this approach is similar to that taken by the United States Supreme Court. In Imbler, 424 U.S. at 430-31, the Supreme Court held that a prosecutor was immune from civil liability in initiating a prosecution and presenting the state's case, conduct it deemed "intimately associated with the judicial phase of the criminal process." Thus, we focus on whether the County Attorney's alleged wrongful conduct was prosecutorial in nature or, in other words, whether the conduct occurred in the course of filing and maintaining criminal charges.

Richard was charged with robbery upon his arrest in February of 1989. The County Attorney's failure to notify the County Jail of Richard's alleged suicidal tendency occurred more than two months later in May of 1989 following receipt of the State Hospital report allegedly containing that information. It is clear that the conduct of the County Attorney at issue here was not related to his decision to file, or the actual filing of, the criminal charge against Richard.

6

Nor did the County Attorney's failure to act relate to his decision to continue, or "maintain," the criminal charge against Richard. The State correctly points out that the County Attorney received the psychiatric report in connection with Richard's prosecution during the period the original charge was of record. The asserted omission by the County Attorney, however, did not relate to information provided to facilitate Richard's prosecution, namely, whether Richard suffered from a mental disease or defect and had the capacity to stand trial and form the requisite mental state. It involved information purportedly indicating Richard's severe depression and suicidal tendency, information extraneous to Richard's prosecution.

By determining that prosecutorial immunity applies only to actions of county attorneys in the course of filing and maintaining criminal charges, we properly limit the protection that doctrine affords to conduct inherent in a county attorney's prosecutorial function. The County Attorney's conduct at issue here--failure to notify the County Jail of allegedly lifesaving information--is not integral to that function. While maintaining the safety of individuals incarcerated is important to the criminal justice system, the County Attorney's decisions in that regard are part of his administrative function. We agree with the Ninth Circuit Court of Appeals that acts or omissions of a prosecutor involving conditions of post-arrest confinement are not protected by prosecutorial immunity because they lack an intimate association with the prosecutorial phase of the criminal process. Gobel v.

7

Maricopa County (9th Cir. 1989), 867 F.2d 1201, 1206.

The United States Supreme Court has applied a similar functional analysis to determine the scope of a prosecutor's conduct which is covered by absolute immunity. Buckley v. Fitzsimmons (1993), ___ U.S. ___, 113 S.Ct. 2606, 125 L.Ed.2d 209; Burns v. Reed (1991), 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547. Under that approach, the nature of the function performed is the determinative factor, rather than the identity of the actor who performed it. Buckley, 113 S.Ct. at 2613. Only the prosecutor's conduct having a function closely associated with the judicial phase of the criminal process was entitled to absolute immunity. Buckley, 113 S.Ct. at 2615-18; Burns, 111 S.Ct. at 1942-44. Indeed, the Supreme Court expressly stated that a prosecutor was not immune from liability for administrative duties. Buckley, 113 S.Ct. at 2615.

In Burns, the Supreme Court also clarified that absolute immunity addressed the concern that the judicial process might be affected by vexatious litigation. On that basis, it determined that absolute immunity was justified only for conduct "connected with the prosecutor's role in judicial proceedings." Burns, 111 S.Ct. at 1943. Thus, the rationale underlying prosecutorial immunity does not justify shielding a prosecutor from exposure to liability for administrative decisions such as those in the case before us. While a lawsuit arising from the breach of a duty to prevent the suicide of an individual held in custody would undoubtedly divert the County Attorney's attention, the fear of

8

such litigation would not affect his independent judgment in filing and maintaining criminal charges.

Because the County Attorney was not acting within his prosecutorial capacity when he failed to advise the County Jail of information allegedly indicating Richard's suicidal tendency, we hold that the District Court erred in concluding that the County and the State were entitled to prosecutorial immunity. We reverse, however, only the District Court's grant of summary judgment in favor of the County. The State contends that it is entitled to summary judgment on other grounds and we agree.

The State argued before the District Court that it was not liable for conduct of the County Attorney because he was not an employee of the State, relying on a recent opinion issued by the Attorney General. The District Court did not address that issue, granting summary judgment solely on the basis of prosecutorial immunity. We will uphold the result reached by the district court, if correct, regardless of the reasons given. Stansbury v. Lin (1993), 257 Mont. 245, 248, 848 P.2d 509, 511.

On appeal, Smith effectively concedes that the Attorney General has determined that county attorneys are not employees of the State with regard to their administrative conduct and does not refute the State's argument. In light of our determination that the County Attorney was acting within his administrative capacity and Smith's concession, we conclude that the State is entitled to judgment as a matter of law and affirm the court's grant of summary judgment in its favor.

Did the District Court abuse its discretion in denying Smith's motion to amend the complaint?

The District Court refused to allow Smith to add the following paragraph to her negligence and wrongful death claims:

> Montana State Hospital, and [sic] agent or employee of Defendant State of Montana, failed to notify the Butte-Silver Bow County jail staff that Mr. Smith was a suicide risk, and failed to continue the deceased's medication at the Butte-Silver Bow county jail. Said conduct was a direct and proximate cause of the decedent's death.

The grant or denial of leave to amend pleadings is within the discretion of the district court and will not be reversed absent an abuse of that discretion. Priest v. Taylor (1987), 227 Mont. 370, 378, 740 P.2d 648, 653.

As its first basis for denying Smith's motion to amend, the District Court determined that amendment would be unduly prejudicial to the State. We agree. The amendment alleges negligence based on the failure by State Hospital employees to continue Richard's medication. Such a claim may well be one for medical malpractice; in any event, it is a totally new theory not included in the original complaint and based on acts or omissions by persons not parties to the original action. Similarly, the proposed claim against the State based on State Hospital employees' failure to notify jail staff of Smith's alleged suicidal tendency, while essentially the same theory as that originally asserted against the County and the State, was based on acts or omissions by persons not parties to the original action. In order to defend against these claims, the State would be required to expend a considerable amount of money and time to conduct additional discovery.

10

Moreover, Smith possessed the basic information needed to advance a negligence claim premised on the State Hospital's failure to alert the County Jail of Richard's suicidal tendency at the time she filed the original complaint. She offers no explanation for her failure to plead this claim until one and one-half years later.

Rule 15(a), M.R.Civ.P., allows parties to amend pleadings by obtaining leave of the district court and requires the court to grant leave "when justice so requires." Although the rule has been liberally interpreted, a district court is justified in refusing amendment because of undue prejudice to the opposing party, undue delay, and dilatory tactics by the moving party. Lindey's v. Professional Consultants (1990), 244 Mont. 238, 242, 797 P.2d 920, 923. The prejudice sufficient to support a court's denial of a motion to amend can be of precisely the kind faced by the State here--added time, energy and money in resolving the case due to additional discovery and time to determine the sufficiency of the claims alleged in the amended complaint. See Lindey's, 797 P.2d at 923. We conclude that the District Court did not abuse its discretion in refusing to allow amendment of Smith's complaint under Rule 15(a), M.R.Civ.P.

As a second basis for denying Smith's motion to amend, the District Court determined that the amendment did not relate back to the date of the filing of the original complaint and, as a result, that the new negligence and wrongful death claims were barred by the statutes of limitations. The amendment would relate back to the filing of the original complaint if the claims contained in the

11

amendment arose out of the "conduct, transaction, or occurrence" set forth or attempted to be set forth in the original pleading. Rule 15(c), M.R.Civ.P. We previously have focused on whether the amended and original pleading are based on the same set of operative facts to determine whether they arise from the same conduct, transaction or occurrence. Sooy v. Petrolane Steel Gas, Inc. (1985), 218 Mont. 418, 422-23, 708 P.2d 1014, 1017.

It is clear that the original complaint and proposed amendment do not share the same operative facts. First, they involve acts or omissions by different individuals. The original complaint focuses on inaction by agents or employees of the County. The proposed amendment alleges omissions by employees of the State Hospital.

Furthermore, the alleged conduct of State Hospital employees and County personnel is not the same. The proposed amendment alleges negligent failure to continue Richard's medication following his escape from the State Hospital and reincarceration at the County Jail, an occurrence not at issue in the original complaint. In addition, while the proposed amendment and original complaint both allege a failure to notify the County Jail that Richard was suicidal, the omissions were made by different individuals and occurred on different dates. State Hospital personnel learned of Richard's purported depression and suicidal tendency during the psychiatric examination which took place between his March 30 admission and May 6 escape. Thus, their failure to notify the County Jail of Richard's purported depression and suicidal tendency would begin on May 11, when he was

12

recaptured. The County Attorney received the State Hospital report on March 17; any omission on his part occurred on or after that date.

We conclude that the District Court did not abuse its discretion in determining that Smith's proposed amendment did not arise from the same "conduct, transaction, or occurrence" as the original complaint. Because the amendment did not date back to the filing of the original complaint under Rule 15(c), M.R.Civ.P., the District Court properly determined that Smith could not amend the complaint to add additional negligence and wrongful death claims because the statutes of limitations for those causes of action had expired.

We hold that the District Court did not abuse its discretion in denying Smith's motion to amend the complaint.

Did the District Court err in dismissing Smith's action under Rule 37, M.R.Civ.P.?

As set forth above, the County moved to dismiss Smith's claims in September of 1992, based on her alleged failure to answer interrogatories and supplement discovery requests. After a hearing held on November 4, the District Court held the motion in abeyance and ordered Smith to submit supplemental discovery responses within thirty days of the hearing. Shortly thereafter, the County moved for a psychological examination of Richard's children. The court granted the motion and ordered the examination.

The County filed a second motion to dismiss with prejudice in December of 1992, asserting that Smith continued to abuse discovery

13

and had obstructed the psychological examination. Following a hearing on April 30, 1993, the District Court dismissed Smith's complaint without prejudice pursuant to Rule 37(b), M.R.Civ.P. The court determined that Smith had failed to comply with its orders compelling discovery and requiring a psychological examination of Richard's children.

The parties advance numerous and varied assertions as to the arguments and evidence presented at the November 4 and April 30 hearings. Smith asserts that the District Court improperly overlooked evidence indicating her compliance with the court's orders regarding discovery and the examination of the children. She specifically argues that the County obtained all requested information regarding tax records, medical records and expert witnesses and had, itself, abused discovery by withholding information and obtaining confidential records beyond the scope of discovery. The County disagrees in every respect.

While the hearings apparently were reported by a court reporter, transcripts of the proceedings were not provided to this Court on appeal. Nor does the record contain formal Minute Entries recording the highlights of the hearings. The Register of Action accompanying the record on appeal indicates the hearing dates but sheds little light on the substance of the hearings. Under these circumstances, we cannot reconstruct the record before the District Court to determine which party's arguments are supported by the record.

In addition, we are unable to understand or adequately

14

interpret the District Court's dismissal of Smith's action <u>without</u> prejudice in the context of this case. The County sought the sanction of dismissal with prejudice as authorized by Rule 37(b), M.R.Civ.P., for certain discovery-related acts or omissions. A <u>sanction</u> of dismissal <u>without</u> prejudice is, at best, an anomaly; indeed, it appears to controvert the District Court's observations concerning Smith's counsel's discovery abuses and defiance of its orders.

Moreover, it appears that the District Court may have entered the dismissal without prejudice in order to facilitate Smith's interest in obtaining this Court's review of earlier rulings. The court noted her efforts--a premature appeal and an unsuccessful petition for writ of supervisory control--and stated that its dismissal without prejudice would facilitate our review of its previous rulings before a potentially expensive jury trial took place. We will not condone a trial court's dismissal of an action without prejudice, in the guise of a sanction, where the intent is to obtain review of rulings otherwise not appealable under Rule 1, M.R.App.P.

Because of the state of the record before us on this issue and the court's dismissal language, we decline to rule on the propriety of the District Court's dismissal of Smith's complaint pursuant to Rule 37(b), M.R.Civ.P. We vacate the court's order dismissing the complaint without precluding the availability of further proceedings on the issue on remand.

Affirmed in part, reversed in part, vacated in part, and

15

remanded for further proceedings consistent with this opinion.

_Karla M. Gray_
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

16

Chief Justice J. A. Turnage, concurring:

I specially concur in the majority opinion. I recognize that this opinion involves a criminal prosecution and discusses the county attorney's protection from civil litigation in duties relating to prosecution of criminal matters as distinguished from what the majority opinion has held to be an administrative matter.

My concern, however, is that the majority opinion not be read or understood to exclude the county attorney's protection from civil litigation in the many duties mandating the county attorney to institute or defend judicial proceedings in non-criminal matters.

County attorneys in Montana are required by statute to appear in court on behalf of the state in a wide variety of non-criminal matters. A partial list of those duties includes:

- defending suits against the county under § 7-4-2711, MCA;

- representing veterans in reemployment actions under § 10-2-214, MCA;

- representing election judges in challenges to electors under § 13-13-305, MCA;

- filing actions to enjoin a public nuisance under § 16-6-313, MCA;

- prosecuting or defending actions by or against a school district or community college district under § 20-1-204, MCA;

- prosecuting injunction actions against persons unlawfully practicing as a dentist under § 37-4-328, MCA;

- filing abuse, neglect, or dependency petitions under § 41-3-401, MCA;

- filing petitions for termination of the parent-child relationship under § 41-3-607, MCA;

17

♦ filing petitions for civil penalties for health care facility violations and for long-term health care facility violations under §§ 50-5-112 and 52-3-605, MCA;

♦ filing petitions for appointment of a guardian of an AFDC grant for the benefit of children under § 53-4-243, MCA;

♦ filing petitions for involuntary placement of seriously developmentally disabled persons in residential facilities under § 53-20-121, MCA, and for commitment of mentally ill persons under § 53-21-121, MCA;

♦ filing eminent domain proceedings under § 60-4-104, MCA;

♦ representing the State in actions to suspend a license to operate commercial vehicles under § 61-8-805, MCA;

♦ filing actions to impose civil penalties for air quality violations under § 75-2-413, MCA, solid waste management violations under § 75-10-228, MCA, and hazardous waste violations under § 75-10-417, MCA;

♦ representing the Department of Commerce in actions by or against it, including injunctions and mandamus actions under § 81-23-406, MCA;

♦ filing actions to enforce civil penalties on behalf of the board of oil and gas conservation under § 82-11-150, MCA; and

♦ providing assistance with enforcement of the dam safety act under § 85-15-109, MCA.

The rationale for providing county attorneys with immunity applies equally as to their duties in these non-criminal cases, and bears repeating:

> The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust.

Imbler v. Pachtman (1976), 424 U.S. 409, 422-23, 96 S.Ct. 984, 991, 47 L.Ed.2d 128, 139.

18

The majority opinion must not be read to deny immunity to county attorneys in fulfilling their statutorily-required duties in non-criminal matters. Prosecutorial immunity may well apply in such situations. See e.g., Martin Hodas, East Coast Cinematics v. Lindsay (S.D. New York 1977), 431 F.Supp. 637; Hanson v. Flores (Iowa 1992), 486 N.W.2d 294. Protecting county attorneys from harassment by unfounded or vexatious litigation is just as essential to the functioning of our system of justice in relation to these non-criminal matters as it is in criminal matters.

I submit that the rationale of the United States Supreme Court underlying prosecutorial immunity in Imbler as set forth above clearly supports its adoption in the matters relating to judicial proceedings that are mandated duties of a county attorney in the partial list of such duties above listed.

To subject a county attorney to being civilly sued for damages nearly every time the county attorney is, by law, mandated to initiate or defend judicial proceedings, which litigation would occur with the certainty that a shadow follows its substance, would seriously undermine the performance of a county attorney's duties without fear or favor to the untold detriment of Montana citizens.

I therefore specially concur with the majority's opinion.

_____
Chief Justice

Justice John C. Harrison joins in the foregoing special concurrence of Chief Justice J. A. Turnage.

_____
Justice

Justice Fred J. Weber dissents as follows:

In the first issue of the majority opinion, the opinion holds that the County Attorney was not acting within his prosecutorial capacity when he failed to advise the county jail of information allegedly indicating Richard's suicidal tendency. The majority held that the County Attorney was acting within his administrative capacity and reversed the summary judgment in favor of the County. I dissent from that conclusion and that holding.

The District Court ordered a psychological evaluation by Warm Springs State Hospital to determine whether the defendant had the ability to stand trial. As stated in the report from the State Hospital, Mr. Smith was admitted to the State Hospital on a court order for a psychological\psychiatric evaluation to determine if Mr. Smith suffers from a mental disease or defect; an opinion as to his capacity to understand the proceedings against him and to assist in his defense; and an opinion as to his capacity to have acted purposely or knowingly during the robbery on February 13, 1989, such is an essential element of the robbery offense with which he is charged. The State Hospital report was signed by a psychologist and psychiatrist. The report was 14 pages in length, single spaced. While the details of the report are not before us as a factual issue, the report in substance concluded that the defendant appeared competent to understand the charges against him and to assist in his own defense if he chooses to do so; that his lack of cooperation would be a conscious decision on his part rather than the result of mental illness; and that he appeared

20

capable of acting with knowledge and purpose at the time of the alleged crime. As pointed out in the majority opinion, the plaintiff's claims focused on the failure of the County Attorney to advise the County Jail of the allegedly life saving information in the Report.

In considering the analysis of this issue, we will follow the order of authority set forth in the majority opinion. The majority opinion points out that as quasi judicial officers, prosecutors enjoy immunity from civil liability for conduct within the scope of their duties, allowing the unfettered enforcement of criminal laws. The majority opinion further quotes from Dept. of Justice, 560 P.2d at 1330, pointing out that we consistently have stated that "[w]hen a prosecutor acts within the scope of his duties by filing and maintaining criminal charges he is absolutely immune from civil liability, regardless of negligence or lack of probable cause." In a similar manner, reference is made to Imbler, 424 U.S. at 430-31, where the Supreme Court held a prosecutor to be immune from civil liability in initiating a prosecution and presenting the state's case, conduct it deemed "intimately associated with the judicial phase of the criminal process."

In analyzing whether the failure of the County Attorney is related to the maintaining of criminal charges, the majority states:

> The asserted omission by the County Attorney, however, did not relate to information provided to facilitate Richard's prosecution, namely, whether Richard suffered from a mental disease or defect and had the capacity to stand trial and form the requisite mental state. It involved information purportedly indicating Richard's

21

severe depression and suicidal tendency, information extraneous to Richard's prosecution.

While we do not have the details of the state report before us, I conclude the majority is incorrect when it suggests that the omission by the County Attorney did not relate to information provided to facilitate the deceased's prosecution. As previously indicated, the purpose of the extensive report from the State Hospital was to determine if Mr. Smith suffered from a mental disease or defect, whether he had the capacity to understand the proceedings against him and to assist in his defense, and to determine if he had the capacity to have acted purposely on the date of the offense. It is clear that the purpose of the report is to determine if criminal charges could be maintained against the deceased. Clearly the County Attorney was required to consider this information in order to determine whether or not to continue the prosecution. I don't see how any of the information could be considered extraneous to the prosecution. I conclude that interpreting the report evaluation clearly was within the scope of the duties of a prosecutor and was "intimately associated with the judicial phase of the criminal process." If any aspect of the report demonstrated an unfitness for trial, the County Attorney could not prosecute. "A determination by the county attorney to bring an action is discretionary, and is his duty under the law." Ronek v. Gallatin County (1987), 227 Mont. 514, 518, 740 P.2d 1115; cert denied 484 U.S. 962, 108 S.Ct. 1226, 99 L.Ed.2d 426.

In order to make the determination as to the continuance of the prosecution, the County Attorney had to assess the report in

22

front of him. Interpretation of the report clearly was related to "maintaining" the criminal action. It is not related to the daily running of a county attorney's office. It is impossible to divorce interpretation of this report from the attendant notification of jail personnel.

Determining whether the defendant has a mental disease or defect is an investigative function associated with the charge in question. "Investigative functions carried out pursuant to the preparation of a prosecutor's case . . . enjoy absolute immunity." Freeman ex rel. the Sanctuary v. Hittle (9th Cir. 1983), 708 F.2d 442, 443. "Absolute prosecutorial immunity attaches to the actions of a prosecutor if those actions were performed as part of the prosecutor's preparation of his case, even if they can be characterized as 'investigative' or 'administrative.'" Demery v. Kupperman (9th Cir. 1984), 735 F.2d 1139, 1143, cert. denied, 469 U.S. 1127, 105 S.Ct. 810, 83 L.Ed.2d 803. (Emphasis added.) This consideration reveals the error in the special concurrence's assessment of the dissent. I do not negate the functional analysis provided by the concurrence; I simply disagree that the function in question was "administrative."

The majority opinion concludes that the prosecutorial immunity should be limited to conduct inherent in a county attorney's prosecutorial function. I agree with that standard, except that I conclude that the functions here involved were clearly inherent in that prosecutorial function. The majority opinion concludes that the failure to notify of alleged life saving information is not

23

integral to the prosecutorial function but rather is part of the administrative function of the County Attorney's office.

The majority opinion further refers to Buckley v. Fitzsimmons (1993), 112 S.Ct. 2615-18, where the United States Supreme Court concluded that a prosecutor's conduct having a function closely associated with the judicial phase of the criminal process was entitled to absolute immunity. This demonstrates my disagreement with the majority opinion. The majority somehow has arrived at the conclusion that it is possible to choose some knowledge gained from the report and call action based on knowledge administrative in nature. Under Buckley, the prosecutor's conduct in this case had a function closely associated with the judicial phase of the criminal process, namely to determine whether or not Richard was able to properly stand trial. Clearly the interpretation of the report was connected to the prosecutor's role in the judicial proceeding.

I conclude that the consideration, interpretation, and attendant actions emanating from that lengthy report were clearly within the scope of the duties of the County Attorney and that the contentious actions or omissions were intimately associated with the judicial phase of the criminal process. I further conclude that interpreting the report is "intimately connected" to the duties of the prosecutor. As a result I am unable to see how the alleged omission can be classed as "administrative."

I would affirm the District Court's holding that the County Attorney's conduct was prosecutorial in nature because it occurred

24

in the course of the filing and maintaining of criminal charges.

I would therefore affirm the summary judgment in favor of the County.  I would further join in the majority opinion's affirmance of the summary judgment in favor of the State and also the affirmance of the District Court's refusal to allow amendment of the complaint.

_____<br>Justice

Justice James C. Nelson specially concurs.

I concur with the Court's opinion. My concern is with the Justice Weber's dissent. I submit that the dissent neither correctly interprets the Court's opinion nor does it accurately reflect the current state of the law on absolute quasi-judicial immunity applicable to state prosecutors.

The dissent suggests that any act or omission by a prosecutor which in any way relates to the filing of or maintaining of a criminal charge is closely associated with the judicial phase of a criminal proceeding and is, therefore, entitled to absolute immunity. That, presently, is not the law, if it ever was. Moreover, to the extent that the dissent is read to suggest that we have departed from existing legal concepts defining the scope of or have diminished the protections afforded by absolute quasi-judicial immunity traditionally enjoyed by prosecutors, that, too, is wrong. We have merely applied decades-old controlling legal precedents and concepts to the facts at issue.

At the outset, it is important to keep in mind what this case is about. The immunity issue arose because the District Court granted summary judgment to the County notwithstanding that, according to the record, the parties conceded that there was a factual dispute over whether the report did or did not indicate that Smith was suicidal. The District Court simply concluded that the factual dispute did not count, because, as a matter of law, absolute immunity barred plaintiff's claim. It is the District Court's legal conclusion in that regard that we find in error. The

26

factual question as to whether the report does or does not indicate a potentially suicidal defendant remains a question to be decided by the jury.

The narrow legal question which we address is whether absolute quasi-judicial immunity attaches to the prosecutor's failure to pass along to the sheriff allegedly life-saving information contained in the mental status report from the State Hospital. Our opinion on that issue does not in any way diminish the application of absolute quasi-judicial immunity to the county attorney's decision to request the mental status evaluation in the first place or to his use of the report in maintaining the criminal prosecution against the defendant.

The dissent fails to appreciate or acknowledge the very real and important distinction between, on the one hand, the prosecutorial function of ordering a mental status report and evaluating and utilizing that report with regard to determining the defendant's state of mind at the time of the commission of the offense and with regard to his present ability to stand trial and assist in his own defense, and, on the other, the failure to advise the authority incarcerating the defendant of information contained in that report which may indicate that the defendant is suicidal and which, if available to the jailer, may assist him in preventing that suicide.

While the dissent would have the Court simply ignore that distinction under the broad-brush rationale that any consideration or interpretation of the report by the county attorney is

27

intimately associated with the judicial phase of the criminal process and intimately connected to his duties as a prosecutor, current federal case law, binding upon the courts of this State, compels a decidedly different approach and a much finer analysis than the dissent is willing to accord this issue.

In determining whether the actions of government prosecutors fit within the common-law tradition of absolute quasi-judicial immunity, the United States Supreme Court has, since at least 1976, applied what is characterized as a "functional approach" or analysis.

In Imbler v. Pachtman (1976), 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128, the Court first addressed the immunity of state prosecutors from civil rights suits. Noting that prior immunity decisions were "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it," Imbler, 424 U.S. at 421, the Court held that a state prosecutor had absolute immunity for the initiation and pursuit of a criminal prosection, including presentation of the state's case at trial. Imbler, 424 U.S. at 431. The Court's analysis focused on the functions of the prosecutor that had most often invited common law tort actions, and, while concluding that prosecutors were entitled to absolute immunity for conduct "intimately associated with the judicial phase of the criminal process," Imbler, 424 U.S. at 430, the Court did not attempt to describe the line between a prosecutor's acts in preparing for those functions, some of which were absolutely

28

immune, and his acts of investigation or "administration," which were not. Imbler, 424 U.S. at 430, 431.

In State, Etc. v. Dist. Ct., 8th Judicial Dist. (1977), 172 Mont. 88, 560 P.2d 1328, citing Imbler and the principles underlying the doctrine of quasi-judicial, prosecutorial immunity, we concluded that the prosecutor and his employer, the Department of Justice, were absolutely immune from a civil suit alleging that criminal charges were wrongfully and maliciously filed against the plaintiffs.

Similarly, in Ronek v. Gallatin County (1987), 227 Mont. 514, 740 P.2d 1115, citing Imbler and Dept. of Justice, we, again, concluded that absolute immunity barred the plaintiffs' civil suit for malicious prosecution and civil rights violations filed against the County and arising out of the prosecutor's filing and then dismissing criminal charges against the plaintiffs.

In both Dept. of Justice and Ronek, the prosecutorial function which invoked the application of absolute quasi-judicial immunity was the filing and maintaining of criminal charges; in both cases, the doctrine was correctly applied to protect precisely the type of prosecutorial conduct which was, historically, and, still is, protected under the common-law tradition of absolute quasi-judicial immunity. As in Imbler, in neither case was there any necessity to distinguish between a prosecutor's acts in preparing for initiating a prosecution and in presenting the State's case -- functions historically entitled to absolute quasi-judicial immunity -- and acts of investigation or administration -- functions which were not

29

historically entitled to protection of the doctrine.

In Burns v. Reed (1991), 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547, the Court's immunity analysis was, again, driven by application of the functional approach to the prosecutor's conduct at issue. In that case the Court concluded that appearing before a judge and presenting evidence in support of a motion for search warrant was involved with the prosecutor's " 'role as advocate for the State,' " Burns, 500 U.S. at 486, quoting Imbler, 424 U.S. at 431, n.33. Such conduct was a prosecutorial function entitled to absolute immunity because issuing a search warrant is a judicial act, and appearance at the probable-cause hearing was "'intimately associated with the judicial phase of the criminal process.'" Burns, 500 U.S. at 486, quoting Imbler, 424 U.S. at 430.

On the other hand, the Burns Court held that absolute immunity did not attach to the prosecutor's giving legal advice to the police. Burns, 500 U.S. at 496. On that issue, the Court's analysis is instructive for purposes of our decision in the instant case. As it did in Imbler, the Court initially focused on the historical common-law interests underlying absolute immunity and noted that it could identify no historical nor common-law support for such an extension of the doctrine. Burns, 500 U.S. at 492.

Next, the Court considered whether the risk of vexatious litigation would support absolute immunity for giving legal advice. In that regard it concluded that the purpose of absolute immunity was to "free the judicial process from the harassment and intimidation associated with litigation," [citing Forrester v.

30

White (1988), 484 U.S. 219, 226, 108 S.Ct. 538, 543, 98 L.Ed.2d 555], and "[t]hat concern, therefore, justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." Burns, 500 U.S. at 494.

Importantly, the Court rejected the same sort of broad-brush approach as that offered by the dissent in the instant case. In Burns the United States argued that giving legal advice is "...related to a prosecutor's roles in screening cases for prosecution and in safeguarding the fairness of the criminal judicial process." Burns, 500 U.S. at 495.

> That argument, however, proves too much. Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive.

Burns, 500 U.S. at 495.

Most recently, in Buckley v. Fitzsimmons (1993), 61 USLW 4713, 113 S.Ct. 2606, 125 L.Ed.2d 209, the Court once again stressed the necessity to closely analyze claims of absolute prosecutorial immunity under the functional approach adopted in Imbler and utilized in Burns. Once again, the Court rejected the broad-brush analysis of the Court of Appeals which had concluded that the state prosecutor was entitled to absolute immunity "... because the injuries suffered by petitioner occurred during criminal proceedings." Buckley, 113 S.Ct. at 2615.

> That holding is contrary to the approach we have consistently followed since Imbler ... [which] focuses on the conduct for which immunity is claimed, not on the

31

harm that the conduct may have caused or the question whether it was lawful.

Buckley, 113 S.Ct. 2615.

* * * * *

[A]s the function test of Imbler recognizes, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor.

Buckley, 113 S.Ct. at 2615, quoting Imbler, 424 U.S. at 431.

In Buckley, using the functional approach, the Court held that the prosecutor in that case was not entitled to absolute immunity for alleged misconduct involving investigative and administrative activities in searching for clues and corroborating evidence for purposes of determining probable cause, or for alleged false statements made during the public announcement of a murder indictment. Buckley, 113 S.Ct. at 2616-2617.

As in Imbler and in Burns, the Court in Buckley looked to the functional tie of specific conduct of the prosecutor to the judicial process and to whether the prosecutor was acting in his role as advocate for the State and regardless of whether the conduct at issue might have been integral to the prosecutor's job and might even have served a vital public function. Buckley, 113 S.Ct. at 2618.

While the dissent would have us not pick and choose conduct, that is precisely what the U.S. Supreme Court cases require that we do. We must focus on whether the act or omission at issue is entitled to immunity, not whether the prosecutor is immune for whatever he does in that capacity. As pointed out in Forrester, a case in which the Court applied the same functional approach to a

32

judicial immunity issue,

> [d]ifficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges. Here, as in other contexts, immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches.

Forrester, 484 U.S. at 227. It is the nature of the function performed, not the identity of the actor who performs it, which drives immunity analysis. Forrester, 484 U.S. at 229.

Given Imbler, Burns, and Buckley, this Court is, likewise, compelled to analyze the immunity issue in this case by focusing on the specific prosecutorial conduct at issue and by then determining whether such conduct is functionally tied to the judicial process and involves the prosecutor acting in his role as advocate for the State in initiating and maintaining the criminal prosecution and presenting the State's case at trial. In doing so, we must reject the broad-brush proposed by the dissent, as did the United States Supreme Court in the three federal cases cited.

Using that approach, here, and focusing, as we must, on the specific act or omission at issue, we have correctly determined that, while the prosecutorial function of ordering a mental status report and evaluating and utilizing that report with regard to determining the defendant's state of mind at the time of the commission of the offense and with regard to his present ability to stand trial and assist in his own defense is functionally tied to the judicial process and involves the advocacy role of the prosecutor in initiating and maintaining the criminal prosecution,

33

the alleged failure to advise the authority incarcerating the defendant of information in that report which might indicate that the defendant is suicidal does not serve that function nor meet that test. While absolute quasi-judicial immunity will attach to the prosecutor's conduct in the first instance, it will not apply in the second; absolute quasi-judicial immunity is not available as a defense to plaintiff's complaint in this case.

Accordingly, I concur.

_____
Justice

Justice Terry N. Trieweiler concurs in the foregoing special concurrence.

_____
Justice

34

Justice Terry N. Trieweiler specially concurring in part and dissenting in part.

I concur with those parts of the majority opinion which reverse the District Court's order granting summary judgment to the defendants based on prosecutorial immunity and reverse the District Court's dismissal of plaintiff's claim based on failure to comply with the rules of pretrial discovery.

I dissent from that part of the majority opinion which affirms the District Court's denial of plaintiff's motion to amend her complaint.

Plaintiff's original complaint was filed on April 8, 1991, and named both Silver Bow County and the State of Montana as defendants. In that complaint, it was alleged that the plaintiff's decedent was re-incarcerated at the Butte-Silver Bow County Jail on May 18, 1989, but that because he was depressed and inadequate precautions were taken to protect him from himself, he committed suicide and died on May 28, 1989. The complaint alleged that employees of Butte-Silver Bow County who knew the decedent was depressed and a suicide risk were negligent for failing to take steps to safeguard his life. It alleged that some of these same employees were also employees of the State of Montana, and therefore, that their negligence was attributable to the State of Montana.

On January 13, 1992, the court entered a scheduling order which required that motions and discovery be completed by October 1, 1992, and set October 5 as the trial date. The trial

35

date was later continued to November 2, 1992, and then on September 22, 1992, was vacated and no other date was set.

It was in this posture that on September 29, 1992, plaintiff deposed Virginia Hill, a psychiatrist employed at the State Hospital, who had evaluated the decedent, Richard Smith. Based on her testimony, and less than 30 days following her testimony, on October 22, 1992, plaintiff moved for leave to file an amended complaint which, in essence, simply alleged that State employees other than those originally complained about were also negligent. Plaintiff pointed out that in her deposition Dr. Hill testified that it was the State Hospital's practice to warn jailers when a suicidal inmate was returned to a jail, but that she did not do so in the case of Smith. Therefore, plaintiff simply sought to add the following language to her complaint:

> Montana State Hospital, and [sic] agent or employee of Defendant State of Montana, failed to notify the Butte-Silver Bow County jail staff that Mr. Smith was a suicide risk, and failed to continue the deceased's medication at the Butte-Silver Bow County Jail. Said conduct was a direct and proximate cause of decedent's death.

Other than the allegation about failure to continue medication, the nature of the amended complaint was virtually identical to that of the original complaint except that additional employees of the State were accused of failing to notify Smith's jailers of his mental condition. If the amendment was any more similar to the original complaint, an amendment would not have been necessary.

The District Court denied plaintiff's motion to amend based on its conclusion that the proposed amendment did not relate back to

36

the conduct or occurrence set forth in the original complaint, that the statute of limitations had expired, and that the State would be prejudiced if the proposed amendment were allowed. I disagree and conclude that the District Court abused its discretion when it denied plaintiff's motion to amend her complaint.

Rule 15(a), M.R.Civ.P., provides, in relevant part, that after issues have been joined by a responsive pleading, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." (Emphasis added). Rule 15(b) provides that amendments should even be freely allowed at the time of trial when presentation of the merits of the action are served thereby. The overriding concern is, and always should be, whether the opposing party would be prejudiced by the amendment.

Rule 15(c) provides that even when the amendment states a claim which would be otherwise barred by the statute of limitations it relates back to the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . . ."

We discussed when amendments will relate back to the original complaint in *Prentice Lumber Company v. Hukill* (1972), 161 Mont. 8, 504 P.2d 277. There, we stated with approval the following general rule taken from 3 Moore's Federal Practice § 15.15[3], 1025-27.

> "Rule 15(c) is based on the concept that a party who is notified of litigation concerning a given transaction or occurrence has been given all the notice that statutes of limitations are intended to afford. Thus, if the

37

original pleading gives fair notice of the general fact situation out of which the claim or defense arises, an amendment which merely makes more specific what has already been alleged, such as by specifying particular acts of negligence under a general allegation of negligence, or remedies a defective pleading, will relate back even though the statute of limitations has run in the interim. Similarly, while it is still the rule that an amendment which states an entirely new claim for relief based on different facts will not relate back, <u>if the pleading sufficiently indicates the transaction or occurrence on which the claim or defense is based, amendments correcting specific factual details, such as time and place, as well as other items, will relate back</u>." [Emphasis added].

*Prentice Lumber Co.*, 504 P.2d at 281.

We also stated in *Prentice Lumber Company*, 504 P.2d at 281, that "[i]t is equally clear that an amendment that adds another claim arising out of the same transaction or occurrence will relate back. 3 Moore's Federal Practice, § 15.15[3], p. 1029, and cases cited therein."

In this case, plaintiff originally alleged that employees of the State of Montana failed to notify Smith's jailers of his mental condition, and that as a result, he committed suicide. The amendment simply stated that additional employees of the State of Montana also failed to notify the same jailers of the same mental condition and that the same result occurred. The occurrence giving rise to the claim is the same. The occurrence is the decedent's suicide which resulted from inadequate notice to his jailers. The only thing that changed in the amended complaint were details regarding the specific State employee who had failed to give the notice. For these reasons, the amendment did relate back and the

38

motion to amend should not have been denied based on the District Court's conclusion that it did not do so.

Next, the District Court concluded, and the majority agrees, that the State of Montana would have been prejudiced if the amendment had been allowed. Although no explanation was given by the District Court, the majority reasons that in order to defend against the amended complaint, the "State would be required to expend a considerable amount of money and time to conduct additional discovery." While it is regrettable reality that it costs money to prove claims, as well as to defend against them, in our American system of justice, that is hardly a basis for concluding that prejudice exists which will preclude an amendment. If so, no complaint nor any answer can ever be amended.

The purpose of liberally allowing amendments to the pleadings is to resolve claims on their merits, rather than on procedural technicalities. According to the majority's conclusion, that could never be done.

We also discussed the issue of when amendments should be allowed in *Prentice Lumber Company*. There, we stated that:

> The purpose of Federal Rule 15 is described in 3 Moore's Federal Practice, § 15.02[1], p. 813, in this language:

> "Rule 15 is one of the most important of the rules that deal with pleadings. It re-emphasizes and assists in attaining the objective of the rules on pleadings: that pleadings are not an end in themselves, but are only a means to the proper presentation of a case; that at all times they are to assist, not deter, the disposition of litigation on the merits."

> . . . .

39

"Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded. [Citing Moore's Federal Practice] If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reasons--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be 'freely given.' . . ."

*Prentice Lumber Company*, 504 P.2d at 282.

There is no evidence of bad faith or dilatory motive on the part of plaintiff in this case. Nor were there any previous amendments allowed. The futility of the amendment is argued by the State but was neither addressed by the District Court nor the majority. The sole remaining reason for denying the amendment was prejudice to the defendant. I conclude that prejudice to the opposing party should always be the overriding concern when an amendment which would otherwise allow a claim to be resolved on its merits is proposed. However, in this case, where discovery had been extended by agreement of the parties; where the proposed amendment resulted from information developed from depositions which had been recently taken; and where, finally, the trial date had been vacated and no new trial date had been set so that further discovery was not a problem, there was no prejudice to the defendant.

The mere expense of defending against an amended complaint does not establish prejudice, since it costs money to prove or defend against any claim, and on that basis, every amendment would

40

have to be denied. Therefore, I conclude that the District Court erred when it denied plaintiff's motion to amend her complaint, and I dissent from the majority opinion which affirms that order of the District Court.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing concurrence and dissent.

_____
Justice